**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VICKSON KORLEWALA, et al.** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No.    15-cv-6042** |
| | : | |
| **DETECTIVE SLOBODIAN, et al.,** | : | |
| **Defendants.** | : | |

**M E M O R A N D U M**

SITARSKI, M.J.                                                    December 15, 2016

Currently pending before the Court is a motion for summary judgment filed on behalf of Defendants City of Philadelphia Police Detectives Slobodian, Campbell, Sweeney, Carey and Hunt, (ECF No. 20), ("Defendants" or "Detectives"), and oppositions to summary judgment filed on behalf of Plaintiffs, Vickson and Lorpu Korlewala, ("Plaintiffs" or "Korlewalas"), (ECF Nos. 25, 26, 27).  For the following reasons, summary judgment will be **GRANTED** in favor of Defendants.

## I.      PROCEDURAL HISTORY

Plaintiffs Vickson and Lorpu Korlewala initiated this action on November 9, 2015, against the City of Philadelphia and Detectives Slobodian, Campbell, Sweeney, Carey and Hunt alleging, *inter alia¸* false arrest and conspiracy under the United States and Pennsylvania Constitutions, and municipal liability for failure to train pursuant to 42 U.S.C. §1983.  (Compl., ECF No. 1).  Defendants filed a Motion to Dismiss Plaintiffs' Complaint.  (Mot. to Dismiss, ECF No. 3).  After Plaintiffs filed a response in opposition, (Resp. ECF. No. 5), the Court entered an order granting as uncontested the dismissal of Counts I, IV and V of the Complaint, and granting

Plaintiffs leave to amend Counts II and III.  (Order, ECF No. 6).  Plaintiffs filed an Amended

Complaint against Defendants Slobodian, Campbell, Sweeney, Carey and Hunt on February 10,

2016.  (Amend. Compl., ECF No. 8).  In their Amended Complaint, Plaintiffs asserted two

claims: a false arrest claim against Defendants Slobodian and Campbell for allegedly violating

their rights pursuant to 42 U.S.C. §1983 and the Fourth Amendment to the United States

Constitution, *id.* at 11-12, and a claim for conspiracy to violate their Fourth Amendment rights

pursuant to §1983 against all five named Defendants, *id*. at 12-13.

The parties consented to the exercise of jurisdiction by a United States Magistrate Judge

under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, and the matter was referred to this Court on

May 10, 2016.  (Consent and Order, ECF No. 13).  Discovery is closed, dispositive motions are

fully briefed, and the matter is now ripe for disposition.


## II.        STATEMENT OF FACTS[1]

On February 1, 2014, a ninety-two-year old woman reported to the Philadelphia Police

Department that she had been the victim of a crime.  (Ex. A to DSOF).  The victim, ("R.M." or

"victim 1"), provided a statement to Detective Hunt of the Central Detective Division on March

31, 2014, describing in detail what happened to her on February 1, 2014.  (Ex. B to DSOF;

CSOF ¶¶17-20).  R.M. told Detective Hunt that she was approached by a woman who said she

had found money and that she would share the money with R.M., provided that R.M. first

withdrew money from her bank as a sign of good faith.  R.M. reported she was driven to a

---

[1]  Defendants submitted a Statement of Undisputed Facts, ("DSOF"), (ECF No. 20-1); Plaintiffs filed a response to Defendants' Statement of Undisputed Facts, ("PSOF"), and a Counter-Statement of Undisputed Facts, ("CSOF").  (ECF No. 25, 2-6).  The Court has reviewed the parties' submissions and sets forth those facts that are undisputed or viewed in the light most favorable to the Korlewalas, as the non-moving parties.

Citizen's Bank at the intersection of 20th Street and Market Street in Philadelphia by the woman and a male companion in a "black 4 doors SUV type" vehicle.  (Ex. B, D19; CSOF ¶19).  According to R.M., she entered the bank with the male and withdrew $1200 from her bank account.  She then got back into the SUV with the two individuals who drove one block, at which point the woman said she had to go into a building to retrieve her money.  R.M. exited the vehicle with the woman and started across the street.  R.M. stated that she "turned around" and the woman was "gone with [her] money."  (Ex. B, D20; PSOF ¶4).  In her statement to Detective Hunt, R.M. described the female as a five foot two black woman "in her 60's" with "bad teeth," and described the male as a black, "short small guy in his mid-60s," who walked with a limp and wore a brown trench coat and brown hat with glasses.  (Ex.B; PSOF ¶5; CSOF ¶20).  Police also obtained bank surveillance video from February 1, 2014, showing R.M. being escorted into the Citizen's Bank by a black male who appeared to be in his early 60's wearing a tan trench coat and brown hat.  (Ex. K to DSOF, D76).

On March 31, 2014, an eighty year old woman made a report to Philadelphia Police that she had been the victim of a crime.  (Ex. G to DSOF).  The victim, ("L.R." or "victim 2"), provided a statement to Detective Slobodian of the Southwest Detective Division on April 1, 2014.  (Ex. H to DSOF).  According to L.R., a woman approached her near the intersection of 56th and Market Streets, in Philadelphia, Pennsylvania.  The woman asked L.R. if she wanted to share a "bag of money" with her and a male companion.  L.R. told Detective Slobodian that she was driven by the couple to the Citizen's Bank at 2900 Island Avenue, Philadelphia.  According to L.R., she entered the bank with the male and withdrew $8000 from her Citizen's Bank account.  The male suspect "took the money and put it in his pocket."  (Ex. H, D27).  The couple drove L.R. to 57th Street and Chestnut Street, Philadelphia, where they "pushed [her] out of the

car and drove off."  (Ex. H, D28).  In her statement to Detective Slobodian, L.R. described the

male suspect as a "black man, short not tall, not to (sic.) heavy, older," and the female as "black,

tall, wig, black, (sic.), black clothes."  (Ex. H, D28; CSOF ¶4).  Detective Slobodian provided

L.R. with a photograph from the bank surveillance, which she identified as showing her with the

male suspect who took her money.  (Ex. H D28, D30; CSOF ¶5).

On April 1, 2014, Detective Slobodian interviewed an eyewitness who saw L.R. get

pushed out of a vehicle at 57th and Chestnut Streets.  (Ex. I to DSOF).  The eyewitness,

("V.A."), worked in the Verizon building near the intersection of 57th and Chestnut.  V.A. told

Detective Slobodian that he observed a female driving a "green Saturn SUV" trying to drive off

with an older woman "half way in the car."  (Ex. I, D22).  V.A. saw the car speed away leaving

the older woman crying in the street.  (Ex. I, D23).  In his statement to police, V.A. identified the

suspects' vehicle as a "green Saturn SUV with NM[2] tags, newer looking car."  (*Id*.).  After

reviewing photographs of a "NM" tag and a Saturn model VUE, the eyewitness confirmed that

the suspects' vehicle resembled a Saturn VUE and had NM tags.  (Ex. I, D24).  On or about

April 2, 2014, "flash" information went out over police radio describing the vehicle used in the

crime as a "green Saturn VUE with Mexico license plate."[3]  (Ex. J. to DSOF, D50; CSOF ¶8).

Police also disseminated a photograph of the male suspect involved in the March 31, 2014,

theft.[4]  (Ex. J).

---

[2]  Of course, "NM" is the standard postal abbreviation for New Mexico.

[3]  The description of the flash information that went out over police radio comes from
police paperwork dated April 2, 2014, prepared by police officers Williams and Bond.

[4]  It is not clear from the record where the police obtained this photograph.  Police
documentation references video from the February 1, 2014, incident at the 20th Street Citizen's
Bank, and a photograph taken at the Island Avenue Citizen's Bank on March 31, 2014.

While on patrol in the vicinity of 55th and Market Streets on April 2, 2014, City of Philadelphia police officers Williams and Bond observed a green Saturn with a "South of the Border" bumper sticker parked unattended at 5550 Market Street, Philadelphia. (Ex. J; CSOF ¶9). According to the officers, the vehicle matched the flash information of the car driven by the suspects in the March 31, 2014, theft of victim 2 on March 31, 2014. (*Id.*). Officers Williams and Bond observed a black male matching the picture of the male suspect get in the green Saturn and drive eastbound on Market Street. (*Id.*). The officers stopped the vehicle and identified the driver as Plaintiff Vickson Korlewala. (*Id.*). The vehicle, a green Saturn VUE, was registered to Plaintiffs Vickson and Lorpu Korlewala, a married couple who lived at 5550 Market Street, Philadelphia, Pennsylvania. (Ex. K; Ex. J; *see also* Amend. Compl. ¶¶ 23-24; CSOF ¶10). Based on the information known to the police, Plaintiffs were taken to Southwest Detectives Division on April 2, 2014. (Amend. Compl. ¶¶ 29,38). Police biographical data obtained from Plaintiffs on that date matched the age and height ranges provided by victim 1. (Exs. C and E to DSOF). Detective Hunt observed Plaintiffs and noted that Mr. Korlewala had a "very noticeable limp" and that Mrs. Korlewala had "deformed" teeth.[5] (Ex. K, D76-77).

Police created two photo arrays that included photographs of the Korlewalas. (Ex. K; CSOF ¶10). On April 2, 2014, Detectives DeRose and Horn showed the arrays to victim 2, who positively identified the Korlewalas as the individuals who took her money. (Ex. M to DSOF; CSOF ¶7). Victim 2 circled the photos of the Korlewalas, signed and dated the photo arrays with the circled photographs, and signed and dated the interview statement prepared by Detectives DeRose and Horn. (Ex. M).

---

[5] Plaintiff Vickson Korlewala testified that at the time of his arrest, he walked with a limp. (Ex. D to DSOF). Plaintiff Lorpu Korlewala authenticated photographs of her mouth taken by police at the time of her arrest that show distinctive looking teeth. (Ex. F to DSOF).

On April 2, 2014, Detective Carey interviewed the bank teller who interacted with victim 1 at the 20th Street Citizen's Bank on February 1, 2014.  (Ex. O to DSOF).  He was familiar with R.M. as a regular customer of the bank.  According to the teller, R.M. withdrew about $1100 on February 1, 2014.  The teller noticed a male sitting behind R.M. when she withdrew the money from her account.  In his statement to Detective Carey, the teller described the individual sitting behind R.M. as a "black male, dark complexion, he was wearing a hat, he was in his 50's or 60's."  (Ex. O, D62).  When shown an eight-person photo array, the teller circled the picture of Plaintiff Vickson Korlewala, and wrote the word "possibly" next to Mr. Korlewala's circled photograph.  (Ex. O, D63).  In his April 2, 2014, statement to Detective Carey, the teller explained that "from [his] recollection the male [he] circled most resembles the man that was with [victim 1]" on February 1, 2014.  (Ex. O, D62).

On April 2, 2014, Detective Campbell interviewed the assistant manager of the 57th Street Citizen's Bank who was working on March 31, 2014 when victim 2 made her $8000 withdrawal.  (Ex. N to DSOF).  The assistant manager told Detective Campbell that she remembered L.R. in the bank with a "black male, looked in his fifties, looked about 5'7."  (Ex. N, D37).  Detective Campbell showed the assistant manager an eight person photo array.  She circled the photograph of Plaintiff Vickson Korlewala, (Ex. N, D38), and told Detective Campbell that the "male [she] circled looks like the guy that came in with [victim 2]" on March 31, 2014.  (Ex. N, D37).

Police showed victim 1 (R.M.) photo arrays containing pictures of the Plaintiffs.  Victim 1 was unable to identify the individuals who took her money on February 1, 2014.  (Ex. K, D76; CSOF ¶¶15, 28, 29).

The police also executed a search warrant at the Plaintiffs' home.  (Ex. K, D76).  One of the items recovered at Plaintiffs' residence was a man's brown trench coat that matched the

trench coat worn by the male suspect in the bank video from the February 1, 2014 incident.  (*Id*.).
Plaintiff Vickson Korlewala owned a brown trench coat at the time of his arrest.  (Ex. D).

Detective Hunt prepared affidavits of probable cause for the arrest of the Korlewalas on
three counts of theft and criminal conspiracy.  (Exs.K and L to DSOF; CSOF ¶25).  On April 3,
2014, Detective Hunt submitted the affidavits to Judge James O'Brien for a probable cause
determination.  (Ex. K; Ex. L).  On that day, Judge O'Brien reviewed the affidavits and issued
arrest warrants for the Korlewalas on three counts of theft - theft by deception, unlawful taking,
receiving stolen property - and criminal conspiracy.  (Ex. P to DSOF).  All criminal charges
against Plaintiffs were dismissed on September 19, 2014.[6]  (Amend. Compl. ¶40).


## III.        STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to a judgment as a
matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if it "might affect the outcome of the
suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An
issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-
moving party.  *Id.* at 248-29  It is not the court's role to weigh the disputed evidence and decide
which is more probative, or to make credibility determinations.  Rather, the court must consider
the evidence, and all reasonable inferences which may be drawn from it, in the light most
favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.
574, 587 (1986) *(*citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Tigg Corp. v. Dow*

---

[6]  The record before this Court is silent as to what occurred between the April 2, 2014,
detention of Plaintiffs and the September 19, 2014, dismissal of the charges against them.

*Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and all justifiable inferences are to be drawn in its favor.  *Anderson,* 477 U.S. at 255.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Provided the moving party has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings.  *See Martin v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007).  The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions.  *Trap Rock Indus. v. Local* 825, 982 F.2d 884, 890-91 (3d Cir. 1992).  "If the evidence [put forth by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.*

## IV.    DISCUSSION

Plaintiffs were arrested pursuant to a warrant for allegedly unlawfully taking money from two elderly women after convincing them to make withdrawals from their respective bank accounts.  Criminal charges against Plaintiffs were later dismissed, and they subsequently brought this 42 U.S.C. §1983 lawsuit for false arrest and conspiracy against five detectives involved in the underlying criminal investigation.  Plaintiffs claim that the detectives submitted a false application for arrest warrants, alleging that the affidavit in support of the arrest warrant application included misrepresentations and omitted material facts.  Defendants move for

summary judgment, arguing that probable cause supported Plaintiffs' arrest, and alternatively, assert a qualified immunity defense. [7]  After careful consideration of the record and the submissions of the parties, the Court finds that probable cause existed for Plaintiffs' arrests, and therefore, grants summary judgment in favor of Defendants.

### A.    Fourth Amendment False Arrest Claim

Plaintiffs' Fourth Amendment false arrest claims are made actionable by 42 U.S.C. §1983.  *Albright v. Oliver*, 510 U.S. 266, 274 (1994); *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979) (§1983 is not itself a source of substantive rights, but merely provides "a mechanism for vindicating federal rights elsewhere conferred.").   The Fourth Amendment provides that people are to be secure in their persons "against unreasonable searches and seizures,  . . . and no

---

[7]  Defendants also move for summary judgment because Plaintiffs produced no evidence that Detectives Slobodian and Campbell were personally involved in violating Plaintiffs' constitutional rights.  (Def. Mot. for Summ. J. 9).  In their Amended Complaint, Plaintiffs pled a Fourth Amendment false arrest claim against Detectives Slobodian and Campbell only.  (Am. Compl. Count II).  Liability under section 1983 requires evidence of personal involvement in a constitutional violation.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988) (defendant in a civil rights action must have personal involvement in the alleged wrongs).  Plaintiffs have identified only Detective Hunt as the affiant who allegedly made false statements and omissions in the probable cause affidavit.  (CSOF ¶25).  While the investigative record shows that Detectives Slobodian and Campbell participated in the underlying criminal investigation, the record belies any contention that these detectives submitted the affidavit, much less that they provided false statements in, or omitted material facts from, the affidavit.  Similarly, Plaintiffs have produced no evidence that Detective Carey or Detective Sweeney was personally involved in preparing or submitting the probable cause affidavit.  Instead, Plaintiffs point to irregularities in the underlying criminal investigation such as: Detective Slobodian asking L.R.to review a photograph of her and the male suspect taken at the bank, prior to L.R. picking Plaintiff Vickson Korlewala out of an April 2, 2014, photo array, (CSOF ¶¶5-6); the detectives failing to obtain possible surveillance video from the Verizon building located near the second crime scene, (Resp.at 9); and the detectives failing to ask the victims if the suspects had accents based on Plaintiffs' claim that they have "heavy foreign accents," *id.* at 7-8.  To the extent Plaintiffs complain about negligence, or the officers' alleged failure to conduct a perfect investigation, such claims are not actionable.  *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 n.8.  Accordingly, because there is no evidence of personal involvement in a constitutional violation, summary judgment is granted on behalf of Detectives Slobodian, Campbell, Sweeney and Carey on this additional and alternative ground.

Warrants shall issue, but upon probable cause….”  U.S. CONST. amend IV.  Far from

demanding proof of guilt beyond a reasonable doubt, “[p]robable cause exists if there is a ‘fair

probability’ that the person committed the crime at issue.”  *Wilson v. Russo*, 212 F.3d 781, 789

(3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).  Put another

way, “probable cause to arrest exists when the facts and circumstances within the arresting

officer’s knowledge are sufficient in themselves to warrant a reasonable person to believe that an

offense has been or is being committed by the person to be arrested.”  *Orsatti v. N.J. State

Police*, 71 F.3d 480, 483 (3d Cir. 1995).  “[T]he standard does not require that officers correctly

resolve conflicting evidence or that their determinations of credibility, were, in retrospect,

accurate.”  *Wright v. City of Phila*., 409 F.3d 595, 603 (3d Cir. 2005).

The Supreme Court prescribes a “totality-of-the-circumstances approach” to the probable

cause determination.  *Illinois v. Gates,* 462 U.S. 213, 230 (1983).  That determination is

necessarily fact-intensive, and it will usually be appropriate for a jury to determine whether

probable cause existed.  *See Sherwood*, 113 F.3d at 401.  Nevertheless, summary judgment may

be granted on the question of probable cause if a court concludes that “the evidence, viewed

most favorably to [the non-moving party], reasonably would not support a contrary factual

finding.”  *Id*.  The Third Circuit recently acknowledged the “tension inherent in evaluating

probable cause at the summary judgment stage” explaining:

> On the one hand, the summary judgment standard asks whether
> there is a “genuine dispute as to any material fact,” Fed. R. Civ. P.
> 56(a), viewing the evidence “in the light most favorable to the non-
> moving party,” *Reedy*, 615 F.3d at 210.  On the other hand, the
> probable cause standard by definition allows for the existence of
> conflicting, even irreconcilable, evidence.  *See, e.g., Wright*, 409
> F.3d at 603.
>
> . . .

> While it is axiomatic that at the summary judgment stage, a court must view the facts in the light most favorable to the nonmoving party, it does not follow that we exclude from the probable cause analysis unfavorable facts an officer otherwise would have been able to consider.  Instead, we view all such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a "fair probability" that a crime occurred.  Only then would the existence of conflicting evidence rise to the level of a "genuine dispute as to any material fact" such that summary judgment would be inappropriate.  Thus, where the question is one of probable cause, the summary judgment standard must tolerate conflicting evidence to the extent it is permitted by the probable cause standard.

*Dempsey v. Bucknell University.*, 834 F.3d 457, 468 (3d Cir. 2016).

Where, as is the case here, an arrest is made pursuant to a warrant, a plaintiff may succeed in a §1983 false arrest action only where:  (1) the officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant," and (2) "such statements or omissions are material, or necessary to the finding of probable cause."  *Wilson*, 212 F.3d at 786-87; *Franks v. Delaware,* 438 U.S. 154, 171-72 (1978).  Here, the Court will undertake the analysis for reviewing a probable cause determination recently outlined by the Third Circuit in *Dempsey* by: (1) considering the evidence that Plaintiffs contend was falsely asserted or omitted; (2) reconstructing the affidavit by including any recklessly asserted or omitted information, and (3) assessing the materiality of the improper information to the probable cause standard. *Dempsey*, 834 F.3d at 470.

### 1.      Misrepresentations or Omissions

Plaintiffs argue that the affidavit submitted by Detective Hunt contained misstatements and omissions.  A court faced with a claim that an arrest warrant contains false assertions or omissions must first determine whether the officer made those false assertions or omissions

either deliberately, or with reckless disregard for their truth. *Reedy v. Evanson*, 615 F.3d 197, 213 (3d Cir. 2010). An assertion is made with reckless disregard when, "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Wilson*, 212 F.3d at 788. Assertions can be made with reckless disregard for the truth "even if they involve minor details—recklessness is measured not by the relevance of the information, but the demonstration of willingness to affirmatively distort truth." *Id.* Omissions are made with reckless disregard for the truth when an officer recklessly omits facts that "any reasonable person would know that a judge would want to know in making a probable cause determination." *Reedy*, 615 F.3d at 213. A court's determination of "whether an affidavit is false or misleading must be undertaken with scrupulous neutrality." *Reedy*, 615 F.3d at 214, n.24, citing *Wilson*, 212 F.3d at 787 (citations omitted).

Here, Plaintiffs identify three false assertions allegedly made by Defendant Hunt in the affidavit of probable cause: (1) that victim 1 "got into a dark colored SUV type vehicle" as opposed to a "black 4 doors SUV type vehicle" as described by victim 1 in her police statement; (2) that victim 1 saw the female suspect re-enter the vehicle after taking her money; and (3) that the vehicle located in front of Plaintiffs' residence and registered to them was a "dark green Saturn SUV with a New Mexico Bumper sticker on the rear," instead of the green Saturn SUV with a "South of the Border" bumper sticker and Pennsylvania licenses plates actually owned by the Korlewalas. (Resp. 11-13).

Detective Hunt summarized the information available to him about the February 1, and March 31, 2014, incidents and prepared identical affidavits of probable cause for the arrest of the Korlewalas. As to the color of the suspects' vehicle, Detective Hunt stated in paragraph one of

the affidavit that the victim 1 "got in to a dark colored SUV type vehicle."  Plaintiffs are correct

that victim 1 actually described the suspects' vehicle as a "black 4 doors SUV type vehicle."

(Compare Ex. K, D76 to Ex. B, D19).  However, Detective Hunt includes that very language in

the second paragraph of the affidavit, noting that victim 1 "stated the vehicle belonging to the

offenders was a Black SUV type vehicle."  (Ex. K).  While the Court notes that describing the

vehicle as "black" as opposed to "dark colored" is a distinction without much difference, this

correction will be included in the reconstructed affidavit.

Next, Plaintiffs correctly note that Detective Hunt's description of the vehicle found in

front of their house on April 2, 2014 was inaccurate in some respects.  In the affidavit, Detective

Hunt wrote that "police located a dark green Saturn SUV with a New Mexico Bumper sticker on

the rear."   (Ex. K).  It is undisputed that this statement was an error: the bumper sticker on the

Korlewalas' Saturn SUV read "South of the Border," with no mention of New Mexico on the

vehicle.  (Ex. J, D50).  It is also undisputed that the Korlewalas' vehicle had a Pennsylvania

license plate, not "New Mexico tags" as reported by the eyewitness to the March 31, 2014,

incident.  (Compare Ex. J, D50 to Ex. I, D23).

Detective Hunt also indicated in his affidavit that victim 1 saw the female suspect "run

back" the vehicle and drive away with her money, when victim 1 actually stated that she turned

around and the female was "gone" with her money.  (Compare Ex. K, D76 to Ex. B, D20).

In the context of this case and the allegations included in the affidavit, the Court finds

that the incorrect information regarding the "South of the Border" bumper sticker was relevant to

the probable cause determination, and thus should be included in a reconstructed affidavit.

While a close call, the Court will also replace the references to a "dark colored" vehicle in the

reconstructed affidavit.  However, we do not find the statement regarding the female suspect

13

running back to the vehicle (as opposed to disappearing with the victim's money) necessary or relevant, and therefore, this statement need not be included in the reconstructed affidavit.

Finally, Plaintiffs claim that Detective Hunt omitted a statement in the affidavit about his own inability to positively identify Vickson Korlewala as the male suspect in the February 1, 2014 bank surveillance video. (Resp. 12). Plaintiffs cite to the following exchange in Detective Hunt's deposition:

> Q: Let's talk about what we don't see here which is the video. And I am going to ask you, did the individual on the video of that 2/1 job look identical to my client [Vickson Korlewala]?
>
> A: No, but he did fit the physical description and he did have the walk and he did have a limp.

(Resp. at 12).[8] Assuming Plaintiffs' recitation of Detective Hunt's deposition testimony is correct, that testimony only establishes that Detective Hunt personally did not think Vickson Korlewala looked "identical" to the male suspect in the surveillance video. Detective Hunt did state that Mr. Korlewala fit the physical description of the male suspect, and walked with a limp as described by victim 1. The Court finds that Detective Hunt's personal inability to positively identify the suspect is "not the kind of thing the judge would wish to know," and therefore, is not material to the probable cause determination. This omission will not be included in the reconstructed affidavit.

Notwithstanding errors in the affidavit prepared by Defendant Hunt, there is no evidence in the record that would support a jury's conclusion that Hunt deliberately made false assertions or omissions in the affidavit. However, because Plaintiffs adduced sufficient evidence that a

---

[8]  Throughout their filing, Plaintiffs cite to transcripts and testimony of Detectives Hunt and Slobodian, (Resp. 4-6, 9, 12-13). However, Plaintiffs did not submit any portion of the transcripts in support of their opposition.

reasonable jury could conclude that Detective Hunt acted with reckless disregard for the truth by describing the vehicle registered to Plaintiffs as having a "New Mexico bumper sticker" not a "South of the Border" bumper sticker, the Court will reconstruct the affidavit with the correct information, and consider whether the recklessly made statements were material to the probable cause determination. We will also replace references to a dark colored car with "black" when referring to the vehicle used by the suspects.

### 2. Reconstructed Affidavit for Materiality Analysis

As instructed by the Third Circuit in *Dempsey*, the Court reconstructs word-for-word Detective Hunt's April 3, 2014, affidavit, correcting it to include relevant information found to be recklessly disregarded by Detective Hunt, and the "other information that gives it context." 834 F.3d at 475.

> On 2/1/14, at approximately 2:45pm, the complainant was approached by an unknown B/F in the area of 11th & Chestnut St, who stated that she had just found a bag of money which she opened and showed the money to the complainant. The unknown female stated that she would share the money with the complainant, but she (compl) first had to withdraw money from her bank in good faith. The complainant states while talking with the female a B/M approached her and stated that he was the unknown females' (sic) Pastor. The complainant stated they asked her where her bank was located and said that they would drive her there. The complainant got in to a ~~dark colored~~ [**black**] SUV type vehicle that the unknown female was driving. The unknown male got in to the rear seat and the complainant was seated in the front passenger seat. The female drove the complainant to the Citizen Bank located at 20th & Market St. The unknown female let the complainant out of the vehicle in front of the bank and told the male to escort her in to the bank. The Complainant went to a Teller and withdrew $1200 dollars, while the male sat in a chair behind her. The complainant and the male then left the bank together. When the complainant got back in the car she gave the money to the female and asked for her money. The unknown female told the complainant that she had to go get her money from inside a building. The female then drove about another block up Market St and parked. She told the complainant to follow her to a building across Market St. The unknown female walked the complainant across the street and then ran back to her car and fled with the complainant's money.
>
> Video was obtained from the bank which showed the complainant being escorted into the bank by a B/M who appeared to be in his early 60s, wearing a tan Trench

Coat and Brown hat.  The male walked the complainant to the Teller and then sat in a chair behind her.  The complainant was interviewed on 3/31/14 and during her interview she described the unknown male as being a B/M in his 60s, short, small guy with a limp.  The male was also wearing a brown Trench coat and brown hat.  The complainant described the female as a B/F in her 60s but a little younger then the male, about 5'2 with bad teeth, wearing a black tam (hat), black coat, and black pants.  Complainant stated the vehicle belonging to the offenders was a Black SUV type vehicle.

On 4/2/14, the assigned was contacted by Detectives from SWDD who stated that they had a job (14-18-17308) involving an 80 yr old female complainant who was approached by a middle age B/F who stated she had found some money and that she would share the money with her.  The complainant was also approached by a B/M who stated he knew the female and that she gave him a share of the money.  The unknown female and male then asked about this complainant's bank and got her into their [~~dark colored SUV type~~][9] vehicle.  The female was driving and the male got in the rear.  They then drove this complainant to the Citizens Bank located at 2900 Island Ave, where the unknown male escorted the complainant inside the bank while she withdrew $8000 dollars. When the complainant got back in the car and asked for her money the offenders told her the female had to go get the money.  They drove to 57th & Chestnut and pushed the complainant out of the vehicle and fled with her money.  This complainant describes the male as a B/M, short, not heavy, and older.  She describes the female as a B/F, tall, wig, and black clothes.  [**~~The vehicle she described as a black SUV.~~**]  An eyewitness saw the complainant being put out of the car on Chestnut St and called police.  He described the car as a green Saturn SUV with New Mexico Tags.

On 4/2/14, police located a dark green Saturn SUV with a ~~New Mexico~~ [**South of the Border**] Bumper sticker [**and a Pennsylvania license plate**][10] on the rear, parked on the 5500 block of Market.  The tag was ran thru NCIC and came back to a Vickson Korlewala and Lorpu Korlewala 5550 Market St.  This male's photo was pulled up on JNET and compared to photos of the male offender from the Citizens Bank on Island Ave.  The man and his wife were placed in a photo array and both were positively identified by SWDD's complainant.

---

[9]  Although Plaintiffs did not raise the issue, the Court notes that police did not ask victim 2 to describe the suspects' vehicle.  Consistent with the discussion in Section IV(A)(1) the Court will also remove from the reconstructed affidavit any description of the suspects' vehicle attributed to victim 2.

[10]  Although Plaintiffs did not clearly advance this argument in opposing summary judgment, the Court will include the fact that the car registered to Plaintiffs had a Pennsylvania, not a New Mexico, license plate.  (Resp. 9, 13).  This information "bears on the materiality" of recklessly omitted information and "should be included in the reconstructed affidavit."  *See Dempsey*, 834 F.3d at 475.

Husband and wife was (sic.) arrested and transported to SWDD.  The photo
array was also shown to the Teller at 20th & Market in reference to this case and
he identified Vickson Korlewala as possibly the male he saw escorting the
complainant in the bank on 2/1/14.  [**The photo array was also shown to the
Assistant Manager from the Citizen's Bank on Island Avenue and she circled a
photo of Vickson Korlewala telling police that he "looks like the guy" that
accompanied Victim 2 on 3/31/14.**][11]  The complainant from this case was
unable to identify (sic.) from the photo array.  A search warrant was obtained for
5550 Market Street and one of the items recovered was a males brown Trench
coat, which matched the one worn in the video from Citizens Bank at 20th &
Market.

Both offenders from the SWDD job fit the complainant's description of the
offenders from CDD right down to their height, size, and age range.  The male
has a very noticeable limp, and the female's teeth are deformed.  The vehicle
used in both jobs is a dark color SUV and the scheme was the same in both jobs.
After viewing the video from the bank, the description of the offenders given by
the complainant in her initial report to police and in her interview, and from my
observation of both offenders in person, I believed (sic.) the same offenders
committed both jobs.

### 3.    Materiality

The Court now turns to the question of whether the recklessly asserted or omitted

statements, considered in the context of the affidavit as a whole, were "material, or necessary to

the finding of probable cause."  *Wilson*, 212 F.3d at 787; *Goodwin v. Conway*, 836 F.3d 321, 327

(3d Cir. 2016).

Statements of a victim witness are typically sufficient to establish probable cause.  *Id.* at

790.  However, independent exculpatory evidence, or substantial evidence of the witness's own

unreliability that is known by the arresting officer, could outweigh witness identification.  *Id.*;

*see also Shaffer v. City of Pittsburgh*, 650 F. App'x 111, 114 (3d Cir. 2016).  In *Wilson*, a photo

---

[11]   On April 2, 2014, Detective Campbell interviewed the assistant manager of the
Citizen's Bank on Island Avenue.  (Ex. N).  She reviewed a photo array, circled the photograph
of Plaintiff Vickson Korlewala and told Detective Campbell that the "male [she] circled looks
like the guy that came in with [Victim 2]" on March 31, 2014.  (Ex. N D37-38).  This
identification was not included in the affidavit of probable cause but can be considered in
conjunction with the reconstructed affidavit.  *See Dempsey*, 834 F.3d at 475 ("[W]here additional
information in the record bears on the materiality of the recklessly omitted information to
probable cause, that additional information should be included in the reconstructed affidavit.").

array was shown to two witnesses, one of whom immediately selected the defendant as the perpetrator of the crime, while the other could not say with certainty that he recognized anyone in the photo array. *Wilson*, 212 F.3d at 785. The affidavit in *Wilson* omitted: (1) a discrepancy between the investigating officer's conclusion that the robber was between 6'3" and 6'5" and the defendant's actual height, 5'11"; (2) the fact that one witness was unable to pick the defendant out of the array; and (3) the fact that another witness saw the defendant at a different location when the defendant was purportedly at the scene of the crime. *Id.* at 788, 791. In affirming the district court's entry of summary judgment in favor of the law enforcement officers, the Court "weigh[ed] the inculpatory evidence against any exculpatory evidence available to the officer" and then concluded that the exculpatory facts were "not strong enough to undermine a finding of probable cause." *Id.* at 791–92.

Here, I conclude that the inculpatory evidence included in the affidavit outweighs the exculpatory available to Detective Hunt. One of the crime victims positively identified the Korlewalas from a photo array as the couple that stole money from her on March 31, 2014. Absent some inherent untrustworthiness in the victim's identification, such identification in itself establishes probable cause to support the Korlewalas' arrest. *See Wilson,* 212 F.3d at 791–92; *Shaffer*, 650 F. App'x at 114-115; *Lincoln v. Hanshaw*, 375 F. App'x 185, 190 (3d Cir. 2010). Without any evidentiary support, Plaintiffs suggest that this victim identification was falsified by unknown individuals. (PSOF ¶ 16; Resp. 14). They point to alleged differences in the signature of victim 2 on three different police documents. (*Id.*) This argument may have been useful as cross-examination or impeachment evidence in an underlying criminal trial to challenge the accuracy of the identification, but it does not negate probable cause given the circumstances here. *See, e.g., Shaffer*, 650 F. App'x at 115; *Goodwin*, 836 F.3d at 329. Plaintiffs' unsupported

18

suspicions do not defeat summary judgment in their civil action. *Trap Rock Indus.*, 982 F.2d at 890.

In addition to the victim identification, the affidavit included other inculpatory evidence in support of probable cause. The Korlewalas matched the physical descriptions provided by victim 1, including their ages and physical characteristics. Victim 1 described the male who robbed her as walking with a limp. Plaintiff Vickson Korlewala admittedly walked with a limp at the time of his arrest, and Detective Hunt noted Vickson Korelwala's "very noticeable limp" in the affidavit. Victim 1 described the female involved in the theft as having "bad teeth." Detective Hunt described Plaintiff Lorpu Korlewala's teeth as "deformed" in the affidavit. In addition, the bank teller from the first crime and the assistant manager from the second crime both stated that Plaintiff Vickson Korlewala "looked like," or "possibly" was the perpetrator. Victim 1 described the vehicle driven by the suspects as a black SUV type vehicle, and the eyewitness who observed the vehicle driven in the second crime describe that vehicle as a green Saturn SUV with New Mexico Tags. A green Saturn SUV with a "South of the Border" bumper sticker and Pennsylvania tags registered to Plaintiffs was located outside their residence only blocks from where an eyewitness saw victim 2 "pushed out" of a "green Saturn SUV with New Mexico tags." Finally, a brown trench coat belonging to Vickson Korlewala and matching the description of the one worn by the male suspect during the first theft was located during a search of the Korlewalas' residence.

The question we must ask at this stage is whether the evidence gave rise to a "fair probability" that the Korlewalas committed the crimes alleged, *Wilson*, 212 F.3d at 789. The Court concludes that the evidence as described here certainly gives rise to a "fair probability"

that the Korlewalas committed the crimes alleged, and therefore, that probable cause to arrest existed.

Having determined that the inculpatory evidence included in the affidavit supports a finding of probable cause, the question remaining is whether exculpatory evidence outweighs the probable cause otherwise established by the affidavit.  *Dempsey*, 834 F.3d at 479.  Detective Hunt included in the affidavit the fact that victim 1 could not identify the Korlewalas in a photo array.  The failure of victim 1 to make an identification of the Plaintiffs does not outweigh the victim identification of victim 2, especially because victim 1 did *not* affirmatively identify someone else as the robber.  *See Shaffer*, 650 Fed.App'x at 115, citing *Wilson*, 212 F.3d at 790 (noting that the case could turn out differently in such a scenario).  Additionally, the Plaintiffs point to the conflicting descriptions of the suspects' vehicle as compared to the Plaintiffs' vehicle.  Victim 1 described a black SUV type vehicle; eyewitness V.A. described a green Saturn VUE with New Mexico Tags; the flash information described a green Saturn VUE with Mexico license plate; and ultimately, the vehicle registered to Plaintiffs was a green Saturn VUE with a "South of the Border" bumper sticker and Pennsylvania tags.  Importantly, probable cause "does not require that officers correctly resolve conflicting evidence," *Wright*, 409 F.3d at 603.  Thus, the Court finds the discrepancies do not constitute "exculpatory evidence" that is "strong enough to undermine a finding of probable cause" based on the totality of the evidence known to Detective Hunt at the time he completed the affidavit.  *See Dempsey*, 834 F.3d at 480.

Reviewing the totality of the evidence included in the reconstructed affidavit, it is clear that the correction of any recklessly made assertions or omissions would not have altered the outcome of the magistrate judge's probable cause determination.  Accordingly, the Court finds

that no reasonable jury could find that the reconstructed affidavit lacked probable cause.[12]

Plaintiffs' Fourth Amendment false arrest claims asserted in Count II of the Amended Complaint

fail as a matter of law.

### B.    Conspiracy Claim

In their second claim, Plaintiffs contend that the five Defendants conspired to violate

their civil rights pursuant to 42 U.S.C. §1983.  (Am. Compl. Count III).

A conspiracy under section 1983 requires that two or more conspirators reach an

agreement to deprive a plaintiff of a constitutional right under color of law.  *Parkway Garage,*

*Inc. v. City of Phila.,* 5 F.3d 685, 700 (3d Cir.1993) (abrogated on other grounds by *United States*

*Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392 (3d Cir.2003)) (citing *Adickes v. S.H.*

*Kress & Co.,* 398 U.S. 144, 150 (1970)).  Such a conspiracy requires a meeting of the minds.

*Startzell v. City of Phila.,* 533 F.3d 183, 205 (3d Cir.2008).  Moreover, a claim of conspiracy in

violation of § 1983 cannot stand absent a viable claim for an underlying constitutional violation.

*White v. Brown*, 408 F. App'x 595, 599 (3d Cir. 2010).  Having found that Plaintiffs'

constitutional rights were not violated because probable cause for their arrests existed, the

---

[12]    Defendants also assert qualified immunity as an alternative basis for summary judgment.  Public officials are entitled to qualified immunity unless their conduct violated a clearly established constitutional right.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  To resolve a claim of qualified immunity, courts engage in a two-pronged inquiry: (1) whether the plaintiff has shown the violation of a constitutional right; and (2) whether the right was "clearly established" at the time of the official's conduct.  *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011).  Here, the Korlewalas claim that Defendants arrested them without probable cause.  A finding of probable cause is therefore "a complete defense to [the Korlewalas'] constitutional claims." *Goodwin*, 836 F.3d at 327.  As set forth above, the Court finds that Plaintiffs' constitutional rights were not violated.  Therefore, the Court need not address the Defendants' argument that they are entitled to qualified immunity.  *See Wright*, 409 F.3d at 599 (stating that qualified immunity comes into play when a state actor's actions give rise to a Section 1983 claim).

Korlewalas § 1983 conspiracy claim necessarily fails.  *Id.*; *see also Haberle v. Troxell*, No. 15-CV-02804, 2016 WL 1241938, at *6 (E.D. Pa. Mar. 30, 2016).

Furthermore, this claim fails because the record is devoid of the type of evidence required to establish conspiracy liability.  Plaintiffs argue that Detectives Slobodian and Hunt shared information and exchanged photographs and notes related to their respective investigations.  (CSOF ¶¶1-2, 22, 24, 28-29; Ex. K, D76).  As the non-moving parties, Plaintiffs are entitled to have all reasonable inferences drawn in their favor at the summary judgment stage.  However, in the absence of any evidence that there was an agreement to deprive Plaintiffs of a constitutional right, *Parkway Garage, Inc.,* 5 F.3d at 700, they are not entitled to an inference that their bare allegations create an issue of material fact for trial.  Plaintiffs have not produced "even a scintilla of evidence" that a conspiracy existed between the detectives to violate their civil rights.  *Lincoln*, 375 F. App'x at 190.

Accordingly, summary judgment is granted in favor of Defendants as to Count III of the Amended Complaint.


## V.        CONCLUSION

For the reasons set forth above, the Korlewalas' claims against the Defendants fail as a matter of law.  Accordingly, summary judgment will be granted in favor of Detectives Slobodian, Campbell, Sweeney, Carey and Hunt.


BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE

22